UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. [UNDER SEAL],                Plaintiffs, v. [UNDER SEAL],                Defendants. | Civ. Action No. _____  **FIRST AMENDED COMPLAINT**  **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**  **DEMAND FOR JURY TRIAL** |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MASSACHUSETTS, STATE OF NEW HAMPSHIRE, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF RHODE ISLAND, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF VIRGINIA, STATE OF WASHINGTON, AND THE DISTRICT OF COLUMBIA<br><br>*ex rel.* MICHAEL PILAT AND PHILIP MANISCALCO<br><br>Plaintiffs,<br><br>v.<br><br>AMEDYSIS, Inc., and Does 1-100,<br><br>Defendants. | Civ. Action No. 17-cv-136<br><br>**FIRST AMENDED COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>FIRST AMENDED COMPLAINT</u>

On behalf of the United States of America and on behalf of the States of California,

Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland,

Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Rhode

Island, Tennessee, Texas, Virginia, Washington, and the District of Columbia, Relator Michael Pilat and Relator Philip Maniscalco file this First Amended Complaint against Defendant Amedisys, Inc. and Does 1-100 (collectively referred to as "Defendant" or "Amedisys"), and alleges as follows:

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the States in connection with a scheme by Defendant designed to manipulate Medicare, Medicaid, TRICARE, and other government funded services (collectively referred to as "Government Health Care Programs") through the submission of false and/or fraudulent claims made or caused to be made for reimbursement of home health care services in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (the "FCA"), and the false claims acts of the States.

2.      From at least 2015 through the present, Defendant has routinely provided inadequate home health services through a scheme designed to churn patients through its program who either do not qualify for coverage or are not receiving sufficient care to justify reimbursement by the Government. Defendant knowingly and/or fraudulently has submitted false billings to the Government, and has falsely certified compliance with CMS guidelines in violation of the FCA.

3.      Amedysis is a publicly traded corporation headquartered in Baton Rouge, Louisiana providing home health and hospice services to approximately 380,000 patients in 36 states, the District of Columbia, and Puerto Rico.

4.      Amedysis operates 329 Medicare-certified home health offices which provide home health care services to patients recovering from surgery, illness, and chronic disease

2

through its partnership with 2,233 hospitals and 61,900 physicians throughout the country. These services are provided both to patients in their homes, as well as to patients in nursing homes and skilled nursing facilities through contracts with those facilities.

5.    Amedysis' services are primarily paid for by Government Health Care Programs. Per its 2015 Annual Report, Amedysis generated over $1 billion in revenue from home health services, with nearly 80% of that coming from Medicare payments.

6.    Relator Pilat was a Clinical Manager Assistant ("CMA") at Defendant's Amherst, New York home health center starting in May 2015, and was responsible for supporting the clinical management teams, including scheduling staff for patient care and managing patient referrals.  The Amherst facility was the second busiest Amedysis facility by patient volume in the country.

7.    Relator Maniscalco is a physical therapist who worked for Defendant also out of its Amherst, New York home health center starting in June 2015, treating patients both in their homes as well as in skilled nursing and rehabilitation facilities in and around Amherst.

8.    During their time at Amedysis, Relators became personally aware of numerous fraudulent practices by Defendant designed to improperly generate or inflate revenues through the Government Health Care Programs, including:

- the aggressive recruitment of patients that resulted in the provision of substandard care that was not covered by Government Health Care Programs;

- the provision of medically unnecessary treatments to patients who did not qualify for home health services under CMS guidelines;

- the falsification of time records in order to bill for services not provided;

- manipulating a patient's plan of care in order to provide a higher level of care than was medically necessary, including accepting recommended care levels from remote coders skilled at maximizing reimbursement, and;

3

- the false and fraudulent recertification of patients for home health services.

9.   In addition to these fraudulent practices, Amedysis also frequently insists that physical therapists make start of care determinations, without any patient history, in order to get patients quickly admitted and loaded into the Amedisys system.   These determinations are made without the assistance or oversight of a physician.

10.   Many of these care determinations are made by coders, remotely, who do not actually see the patients, or have the requisite clinical training to made proper determinations about their care.

11.   Amedysis also, as a matter of practice, manufactures the extent of its patients' injuries and the scope of their therapy needs in order to show greater improvement at the end of care, generating better "star ratings" for the facility.

12.   In most cases, these strategies are employed at the direction and under the guidance of senior Amedysis personnel from its main headquarters in Louisiana, some of which have visited Amherst and other facilities to provide training on these revenue generating strategies.

13.   Defendant employs each revenue generating strategy to maximize its Government Health Care Program payments at great cost to the Government.

14.   Defendant promotes a culture of profits over patient care and falsifies time records to hide this fact, causing the fraudulent billing to the Government.   Under a pay-per-patient compensation scheme, Amedysis encourages it clinicians[1] to see as many patients as

---

[1] "Clinician" refers to any clinician, therapist, or other home health care worker who performs services for patients.

4

possible, regardless of the quality of care provided. Clinicians are regularly scheduled to treat more patients then they can possibly provide proper care for. Some clinicians have complained about the unsafe overscheduling practices. Others have taken full advantage of the compensation scheme. In one case, a clinician saw so many patients that Amedysis received complaints from a nursing home because the patients were not being appropriately vetted for the treatments they were receiving. Rather than rectify the situation, Amedysis transferred the clinician to another location.

16.     Despite this minimal patient care, Amedysis bills the Government for full payment, including by creating falsified time records. In doing so, Amedysis billed Government Health Care Programs for services improperly provided or never provided at all.

16.     Amedysis has forsaken the best interest of its vulnerable patient population, predominately sick and elderly people who are unable to leave their home due to age or illness, in order to squeeze enormous profits through Government Health Care Programs.

17.     In sum, Amedysis' improper patient recruitment, unnecessary and improper treatment, and fraudulent billing practices resulted in thousands of violations of the False Claims Acts of the United States and of the States causing substantial damages to the Government and the American taxpayers.

## PARTIES

18.     Relator Michael Pilat is a citizen of the United States and a resident of the State of New York. Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

5

19.     Relator Philip Maniscalco is a citizen of the United States and a resident of the State of New York.  Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

20.     Defendant Amedysis is a home health and hospice care company based in Louisiana with facilities in 36 states, Washington D.C., and Puerto Rico.

21.     Defendant has five home health facilities in the state of New York.

22.     Plaintiffs are unaware of the true names of certain defendants sued herein under the fictitious names Does 1-100, and will seek leave to amend this complaint to sue such parties by their actual names at such time as Plaintiff becomes aware of them.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This Court has jurisdiction over the subject matter of the State FCA actions pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the State FCA action arises from the same transactions or occurrences as the FCA action.

24.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  During the relevant time period of this First Amended Complaint, the Defendant resided and transacted business in the Western

District of New York, and most of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

25.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each Defendant can be found in, reside in, and transact business in the Western District of New York and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

26.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendant until the Court so orders.

27.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, and upon the Honorable Jeff Sessions, Attorney General of the United States.

28.     Relators are not aware that the allegations in this First Amended Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this First Amended Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because he has provided this information voluntarily to the Government before filing this First Amended Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.        THE FALSE CLAIMS ACT

29.        Originally enacted in 1863, Congress substantially amended the FCA in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

30.        The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. 3729(a)(1)(A), (B), (G) (emphasis added).  Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

31.        Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. 3729(b)(1).

32.        The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the

8

money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

33.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant.

34.     The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

**B.     FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS**

**1)     Medicare**

35.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

36.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

9

37.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services.  CMS establishes rules for the day-to-day administration of Medicare.  CMS contracts with private companies to handle day-to-day administration of Medicare.

38.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services.  These schedules specify the amounts payable for defined types of medical services and procedures.

i.  **Medicare Payments Under Home Health Program**

39.     In 2000, a Home Health Prospective Payment System ("PPS") was implemented pursuant to §4603 of the Balanced Budget Act and as subsequently amended by §5101 of the Omnibus Consolidated and Emergency Supplemental Appropriations.

40.     Home Health Agencies ("HHA") are private organizations that provide skilled nursing and other rehabilitation services to homebound beneficiaries.  Home health services include intermittent skilled nursing services, physical therapy, occupational therapy services, and medical social work.

41.     PPS provides payments to HHAs for the services they provide to patients.

42.     Under PPS, HHAs are paid a fixed per-patient price on a "reasonable" cost basis based on a 60-day episode of care. 42 C.F.R §484.205.  The payment can be adjusted for geographic differences in wages, health condition of beneficiary, needs of the beneficiary, and other factors.

43.     A partial episode payment adjustment may be made if there is an intervening event during the beneficiary's 60-day episode, such as a patient is discharged because they have reached their treatment goals or a patient elects to be transferred to a different HHA. 42 C.F.R §

10

484.205(d)(1).  Such events would necessitate a reduction in the final episode rate payment, which is adjusted to reflect the length of time the patient remained under care as a proportion of 60-day episode. 42 C.F.R. § 484.235.

44.     For 60-day episodes that require or consist of four or fewer visits, PPS provides a low utilization payment amount ("LUPA") which reimburses HHAs for each visit.  Payment amounts are based on the discipline that is performed: home health aide, medical social services, occupational therapy, physical therapy, skilled nursing, and speech language pathology therapy.

45.     PPS also adjusts payments higher based on the projected number of therapy visits in a 60-day episode, which is based on the patient's initial assessment. PPS adjusts payments based on whether one of three (6, 14, 20) visit thresholds limits is met (known as "high-therapy case mix"). Meeting one of these thresholds can increase the Medicare payment for that patient.

46.     Medicare requires that the patient's physician certify the patient's eligibility and need for home health services prior to receiving it. 42 C.F.R. § 424.22(a).  The patient's medical records must support certification. 42 C.F.R. § 424.22(c).  The certification includes certifying that the patient is homebound, that the patient needs part-time or intermittent skilled nursing care and/or skilled rehabilitation, the patient remains under the care of the doctor, and the home health services are necessary and reasonable. 42 C.F.R. §424.22(a).  If documentation does not support a patient's eligibility for home health services, payment will not be rendered.

47.     After a patient is enrolled, HHAs are required to submit patient specific, comprehensive assessments within five calendar days after the start of care. 42 C.F.R § 484.55(b)(1).  The assessment must identify the patient's need for home health care, verify the patient's Medicare eligibility, and provide information that demonstrates a path towards

11

achieving desired outcome of treatment. 42 C.F.R § 484.55. Payments from Medicare are determined based on this assessment.

48.      If at the end of the initial 60-day episode, a patient's physician determines further care is needed, the patient may be recertified for additional 60-day episodes. The recertification must indicate the need for services, an estimate on how much longer the services are needed, and must be reviewed, signed, and dated by the patient's physician prior to starting a new 60-day episode. 42 CFR §424.22.

### ii.  Reasonable and Necessary Services

49.      All claims for Medicare reimbursement must be justified by medical need. "No payment may be made under Part A or Part B for any expenses incurred for items or services … which are not reasonable or necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member". 42 U.S.C. §1395y(a)(1)(A).

50.      Claims for reimbursement cannot exceed the medical needs of the patient and must be economical. "It shall be the obligation of any health care practitioner and any other person (including a hospital or other health care facility, organization, or agency) who provides health care services for which payment may be made (in whole or in part) under this Act, to assure, to the extent of his authority, that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this Act— (1) will be provided economically and only when, and to the extent, medically necessary …" 42 U.S.C. §1320c-5(a).

51.      A medically necessary service is one that, amongst other things, is "appropriate, including the duration … that is considered appropriate for the service, in terms of whether it is furnished in accordance with accepted standards of medical practice …[and is] one that meets,

but does not exceed, the patient's medical need." Medicare Program Integrity Manual, Chapter 13, § 13.5.1. (emphasis added).

52.     The Medicare Claims Processing Manual further explains that "[i]f a service is not reasonable and necessary to treat illness or injury for any reason (including lack of safety and efficacy because it is an experimental procedure, etc.), carriers consider the service noncovered notwithstanding the presence of a payment amount for the service in the Medicare fee schedule." Medicare Claims Processing Manual, Chapter 23, § 30(A).

### 2)     TRICARE

51.     TRICARE is a federal program, which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the federal government.

52.     At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by Defendant have been substantially similar in all material respects to the applicable Medicare provisions described above.

### 3)     Medicaid

53.     Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients.  Medicaid was created in 1965 in Title XIX of the Social Security Act.

54.     Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

55.     At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by Defendant have been substantially similar in all material respects to the applicable Medicare provisions described above.

13

## SPECIFIC ALLEGATIONS

56.     Relator Pilat was hired in May 2015 by Defendant as a Clinical Manager Assistant ("CMA") in its Amherst, NY home health facility, responsible for supporting the clinical management team.  Defendant's home health facilities coordinate the home care of patients in the surrounding areas.  Among his responsibilities as a CMA, Relator scheduled patient visit for clinicians, therapists, registered nurses and other home care workers and managed patient referrals from Defendant's sales teams.

57.     Relator Philip Maniscalco began working for Defendant in June 2015 as a physical therapist.  Defendant's home health services coordinate the rehabilitation and physical therapy care for homebound patients from dozens of regional locations across the country.

58.     Throughout the course of their employment with Defendant, Relators personally observed the following fraudulent practices:

a.  **Improper Recruitment of Patients.** Defendant uses sales teams with relationships with local hospitals and nursing homes to recruit and enroll patients for home health services without properly evaluating their need or eligibility, and often without receiving proper approval from the patient's doctor first and/or evaluating patients.

b.  **Unnecessary and/or Non-covered Patient Treatments.** Defendant provides services to patients beyond the need or benefit of the patient, including treating patients who are not homebound, failing to discharge patients prior to the end of their coverage even when treatment is no longer needed, and/or recertifying patients who no longer need treatment or where treatment is no longer appropriate or beneficial.

c.  **Fraudulent Billing.** Defendant dangerously overschedules its clinicians, beyond the point where they can safely and properly provide patient care; Defendant falsifies time records to hide fraudulent and unsafe practice causing fraudulent billing for services not rendered and/or improperly rendered; Defendant promotes a culture of profits over patient care through a pay-per-patient bonus scheme which encourages fraudulent billing.

14

d. **Upcoding Services to Patients:** Amedysis regularly inflates its Medicare and Medicaid reimbursements by causing a more severe diagnosis than the patient is actually experiencing, providing services that the patient does not need in violation of CMS guidelines. Therapists and nurses are frequently instructed to yield their own assessments to those of coders who remotely review patient information and make coding determinations without having seen the patient face-to-face in violation of CMS regulations. Under CMS regulations, covered services include only those which are medically reasonable and necessary.

e. **Falsifying Time Entries:** Certain physical therapies require a sufficient amount of time to be effective. Amedysis instructs in physical therapists in the nursing home settings to treat multiple patients at the same time, running from patient to patient while they are clocked in with those patients to make it appear as if they are seeing each patient for 30 minutes or more, when in actuality, they are providing those patients with only 5-6 minutes of care.

59. As a result of these fraudulent practices, described below in more detail, Defendant has submitted false billings to Medicare in violation of the FCA and the States FCA.

**A.    Amedysis Improperly Recruits Patients Without Evaluating Eligibility or Need and Without Proper Approval from Physicians**

60. Amedysis is one of the largest home health and hospice care providers in the country with revenues totaling over $1 billion in 2015 and mostly deriving from payments from Government Health Care Programs.

61. From as early as 2008, Amedysis' growth strategy for home health services has been focused on organic growth of fee-for-service Medicare patients. Through this strategy, Amedysis was able to increase same store growth at its home health facilities by 3% in 2015. This helped Amedysis increase its home health revenue year-over-year by nearly $500 million dollars.

62. This growth, however, was achieved using fraudulent recruitment and enrollment practices by Amedysis employees in violation of Government Health Care Programs.

15

63.     Under Medicare and Government Health Care Programs, patients are eligible for home health care if they are homebound and under the care of a doctor who certifies that they need intermittent skilled nursing care, physical therapy, speech-language pathology services, or continued occupational therapy.

64.     Defendant provides these services to patients both at home and at nursing homes.

65.     Before being admitted for services, HHAs must first receive approval from the patient's doctor.  In doing so, the doctor must certify that home health care service is necessary based on, and supported by, the patient's medical records.  The doctor must also continue to treat the patient while receiving home health services.

66.     However, Defendant routinely admits patients for home health care services who do not meet the Government Health Care Program's standards and admits patients without doctor approval, as required Government Health Care Programs.

67.     Specifically, Defendant employs a sales staff who has direct communications with hospitals and doctors, to identify potential patients and enroll them in home health services without properly evaluating their eligibility for the program or need for home health care.  In fact, it is the sales staff, not qualified medical professionals, who often conduct evaluations to determine the patients' needs for home health services.

68.     Further, Relator Pilat personally observed sales staff routinely enrolling patients without first receiving doctor approval, as required by Government Health Care Programs, and seeking approval only after the patients have already enrolled.

69.     Once a patient is enrolled, the sales staff seeks doctor approval through manipulation and pressure sales tactics.

16

70.     In one example, a patient was referred to Defendant by Erie County Medical Center for home care for a fracture.   Defendants tried to initiate care prior to receiving the physician's doctor's approval, but the physician refused to sign any health care orders until they first saw the patient.  In an email on November 22, 2016 to staff, the Director of Operations for Amedysis' Amherst Home Health Facility said, the doctor "is refusing to give us orders to see [the] patient at this time.  He wants to wait until the patient is seen in the office." Relator responded to the Director that same day, "how did we get a referral to take an ortho [patient] without talking to ortho MD, or his rep or having something in writing?" The Director never responded to Relator.

71.     In another example on November 21, 2016, Defendant's sales staff referred a patient for treatment, and Defendant tried to schedule a Start-of-Care visit for November 22. Again however, the doctor had not approved the treatment, nor given Defendant any orders to treat the patient, and the patient's visit was delayed.

72.     Relator Pilat personally observed Amedysis sales staff leveraging their relationships with local nursing homes and hospitals to improperly recruit and refer patients for home care services without conducting a proper analysis or evaluation of the patients' eligibility. In fact, Defendant received so many new case referrals from its sales team, clinicians could not keep up with demand.  During one two-day period alone, Relator personally received 35 new patient referrals from Amedysis sales staff.

73.     These recruiting and sales tactics lead to the admission of patients who were not eligible, nor in need of home health services under the CMS guidelines.

74.     These sales tactics are also in direct violation of Government Health Care Program requirement that doctors approve home health services for patients prior to enrollment.

17

75.     By recruiting and admitting patients without proper analysis and evaluation of eligibility and without physician approval, Defendant violated CMS guidelines and State's law and inflated its billings to Medicare and State funded health care programs.

**B.      Amedysis Fraudulently Bills for Improper and/or Medically Unnecessary Treatment**

76.     Under Government Health Care Programs, reimbursable services must be "medically reasonable and necessary" to diagnose and/or treat an injury.  Further, home health care providers are required to continue to assess the patients' need and benefit of the service to the patient and stop services when the service becomes unnecessary.

77.     Defendant's clinicians fail to assess the needs of the patient and discontinue care when it is no longer necessary or beneficial to the patient, as required under Government Health Care Programs.

78.     Specifically, Defendant provides unnecessary services which increases its case-mix, thus increasing Government Health Care Program's payments.

79.     Relator Pilat personally observed Defendant encouraging clinicians to meet or exceed the case-mix therapy threshold limits of 6, 14, and 20 visits, even though the patient no longer needed home health services.  This allowed Defendant to receive higher case-mix payments for unnecessary treatments.

80.     Additionally, Relator Pilat has personal knowledge that Defendant's clinical staff failed to discharge patients after their initial coverage period and instead recertified them for

18

continued services beyond the patients' need for, appropriateness of, or benefit to the patients. This includes at least one patient with sever Alzheimer's disease.

81.     Like the patient's initial certification, recertification for additional home care must be done by the patient's doctors, prior to the end of the initial 60-day episode, based on the patient's documented medical needs.

82.     Amedysis' therapists and sales staff routinely recommend recertification to the patient's doctors even when they know the patient is no longer in need of, or benefits from, therapy.  In some cases, the clinician recertifies the patient for an additional 60-day episode without getting proper doctor approval.  After recertifying the patient, Defendant then seeks the proper necessary approval from the doctor.

83.     By failing to assess the needs of the patient, Amedysis provides improper and unnecessary services through the manipulation of its high-therapy case-mix and fraudulent recertification.

84.     Similarly, Relator Maniscalco is personally aware that Senior executives and clinical staff, including from Amedysis' corporate headquarters, instructed the nurses and therapists to maximize billings by coding patients at higher than medically necessary levels. Indeed, therapists were instructed to upcode every patient, and if they didn't, offsite coders would do it for them.

85.     In the Summer 2016, at one large group meeting in particular, Amedysis Amherst Director of Operations, along with two VP level employees from the Louisiana corporate headquarters, instructed therapy and nursing staff to code each case a particular way in order to get higher reimbursements.  Among the guidance provided, the staff was instructed to get more patients onto physical and occupational therapy as those treatments generally had the highest

reimbursement levels. In fact, they were instructed to perform a diagnostic test on every patient in order to find at least some issue that would warrant at least 2-4 weeks of treatment, regardless of necessity.

86.     The nursing and therapy staff were also instructed to rely heavily on remotely stationed coders, who reviewed the charts to ensure that the staff was maximizing treatment levels. In many cases, the coders were altering care plans and diagnosis in order to generate higher billings from the Government. Nurses and therapists were instructed to yield to these determinations, irrespective of their independent judgment, despite the failure of these coders to actually see the patients face-to-face, in violation of CMS guidelines.

87.     Some examples of this fraudulent conduct included:

    a.  A female patient in her late-50's with early onset parkinsons completed a six
        week program, and was ready to be discharged to an outpatient. Amedysis
        insisted that her condition be downgraded in order to justify recertifying her for
        another six-,week cycle of treatment.

    b.  A male patient who was sitting to standing with ambulation, was initially coded as
        contact guard supervision, but coders insisted on coding him contact guard to
        minimum to moderate assistance, in order to generate higher reimbursement. He
        was recertified three to four times.

88.     Amedysis management also insisted that therapists do at least ten visits per patient to remain outside of the lower LUPA reimbursement rate, and instructed them to frontload the visits, doing three to four per week, generating substantial fraudulent reimbursements from the Government.

89.     By blindly diagnosing patients without actually seeing them, or making a determination about medical necessity, Amedysis violated CMS guidelines. Amedysis submitted

hundreds of billings to the Government for falsely inflated services, in violation of the FCS and the State FCAs.

      **C.**     **Amedysis Fraudulently Billed for Services Not Rendered or for Patients Not Covered Under CMS Guidelines**

              **1)**  **Overscheduled Clinical Staff Unable to Provide Proper Care**

90.     Amedysis unsafely overschedules its clinicians in order to fraudulently maximize its per-patient Government Health Care Program billings.

91.     Relator Pilat, in his capacity as a CMA, was responsible for scheduling patient visits. Throughout his time employed by Defendant, management pushed him and others to maximize the number of patients visited each week. Because of this, home health clinicians were so overwhelmed with patient visits, it was impossible for them to properly treat their patients.

92.     Clinicians complained about unsafe scheduling and patient loads. Routinely, clinicians were scheduled for 15 to 17 patient visits in a day.  During Relators employment, one nurse was assigned 86 visits for a week; another for 78 visits.  Both nurses complained to Relator about these unsafe schedules during calls and emails between November 22 2016 and November 23, 2016.  Relator relayed the nurse's messages about unsafe workload to Amedysis supervisors.

93.     In order to meet these patient loads during a normal 40-hour work week, clinicians must rush through their patient visits, on average spending well-less than thirty minutes per patient visit.  When you factor in travel time between patients, paperwork, and other routine breaks, patient visits are actually much shorter.

94.     In addition to relaying the concerned nurse's message to management, Realtor also notified management about the unsafe clinician scheduling.  In one November 2016 email Relator told the Director of Operations that he had to schedule visits for "3 times as many

patients as was safe." The Director never responded to Relator's email and Relator was fired a short time after his complaint.

95.    Defendant overschedules clinicians rather than hire additional staff in order to maximize revenues at the expense of patient safety and care.

> 2)  **Amedysis Regularly Misrepresents Treatments to Medicare and Medicaid Patients Who Are Not Homebound, or Are Otherwise Not Covered for Treatment by the Government**

96.    Under Medicare and Government Health Care Programs, patients are eligible for home health care if they are homebound and under the care of a doctor who certifies that they need intermittent skilled nursing care, physical therapy, speech-language pathology services, or continued occupational therapy.

97.    Throughout his employment as a physical therapist with Amedysis, Relator is personally aware that the Amedysis knowingly enrolled Medicare and Medicaid patients who were not homebound.  Amedysis regularly treated these patients who were not covered under the Government Funded Healthcare Programs, and then submitted fraudulent billings to the Government for these services.

98.    Amedysis routinely insisted, as a matter of practice, on "full-service," meaning a full eight weeks of treatment, when much shorter periods of time were medically necessary.

99.    In many cases, physical therapists and nurses raised concerns about this fraudulent practice, and in each case, senior officials at the facility instructed those therapists and nurses to continue seeing the patients, including the Clinical Coordinator, Clinical Manager, and even the Director of Operations.

100.    Among some of the most egregious examples:

a. A female patient approximately 70 years old with a neurological disorder that limited her mobility, but did not preclude her from leaving the house or from driving. Relator Maniscalco recommended a two-week physical therapy program, twice per week, because he recognized that she needed very little assistance. The Clinical Coordinator overruled his clinical diagnosis, without seeing the patient, and instructed Relator to provide a six week physical therapy program, twice per week. Notably, at the time, she was not homebound, and was driving herself to appointments and to run errands. After her six week program, senior management insisted that she be recertified for even more treatment, twice per week for eight weeks, and she was recertified again for another six week cycle, against Relator's objection. After the second recertification, Relator Maniscalco refused instructions by his supervisors to recertify a third time, insisting that she was completely independent and it would be unethical to do so. Throughout this time period, remote coders disguised her independence by downgrading her health status and supervision needs, fraudulently coding her as a "contact guard minimum assist" to justify the additional therapy. Relator Maniscalco's objections were met with a common response by supervisors to complaints by him and other therapists – "everyone benefits from more therapy."

b. Another female patient, in her mid-70's who had fallen and fractured her leg that had already healed. Relator Maniscalco recommended a plan of care that included two therapies per week for four weeks. Coders downgraded her health status, and the Clinical Coordinator instructed him to treat her twice per week for eight weeks. The patient was rarely home, because she could drive and travel on her own, but Amedysis insisted on the extended treatment anyway.

c. A fifty year old man treated by Relator Maniscalco who was mobile, and could get up and down stairs. Relator was instructed to provide a treatment plan for twice per week for eight weeks – again, the full term. Relator Maniscalco was instructed by supervisors and coders to fraudulently write that he was not independent, and needed assistance to get up and down stairs. Relator recommended only four weeks of treatment, and by week six, the patient was getting out of the house himself, doing his own shopping. His therapy continued.

101.    As a result of Amedysis' continued treatment of these patients who were not homebound, or who were not otherwise eligible for health home services under CMS regulations, Amedysis submitted numerous fraudulent billings to the Government in violation of the FCA and the State FCAs. These fraudulent practices have caused millions of dollars in damage to the Government.

### 3) Falsifying Time Sheets

102.    To hide the fact that clinicians are not providing the proper care to patients, management at Amedysis falsifies the time records of the clinicians to comply with Government Health Care Program standards.

103.    Clinicians manage their patient care and enter the time they spend with each patient using hand-held electronic tablets.

104.    Relator Pilat personally observed at least one Director in the Amherst facility change the hours in clinician's hand-held tablets to show that they had spent at least thirty minutes with each patient, when in fact they had spent less time treating the patient.

105.    Nurses and therapists were also instructed by supervisors to falsify time records to give the appearance that more time was spent with the patient than they actually did in order to justify to Government billing.

106.    Similarly, Relator Maniscalco is personally aware that senior officials, including the Director of Operations and a senior vice president from corporate headquarters, instructed nurses at skilled nursing facilities to extend the time with each patient in order to justify a particular billing by seeing multiple patients at the same time while continuing to the run the clocks on their tablet.

107.    For example, if a nurse was providing a treatment with one patient, she would pause that treatment and continue to see other patients, often for shorter therapies like diabetes treatments, and then return to the earlier patient to stop the clock at over 30 minutes, when they really only treated that patient for 5-6 minutes.

24

108.    This deceptive conduct allowed Defendant to bill the Government for inflated treatment levels, and for concurrent treatments, maximizing the amount of revenue generated from the Government Funded Healthcare Programs.

109.    Through this fraudulent billing practice, Defendant submitted and caused the government to pay false claims to the Government. Amedysis' conduct resulted in the submission of false claims.

### 4)  Pay-Per-Patient Compensation Scheme

110.    Lastly, to encourage clinicians to visit as many patients as possible, clinicians are paid on a per-patient basis.  Thus, clinicians churned through patient visits, without regard to the care they provided, in order to receive higher compensation.

111.    Defendant is aware that this compensation scheme encourages fraudulent billing practices.

112.    Relator Pilat personally observed Defendant transfer a clinician to another Amedysis home health facility after receiving complaints from Glenwell Living Community ("Glenwell") in Cheektowaga, NY about the excessive number of patients the clinician saw and the poor care the clinician was providing.  Glenwell was concerned that the high patient volume was compromising patient safety and care. This clinician also had the Defendant's highest patient recertification rate of any clinician in the country.

113.    Relator Pilat is also personally aware of at least two other clinicians, one therapist and one nurse, being transferred to other Amedysis home health facilities after receiving complaints from nursing facilities about proper patient treatment and poor clinical care.

114.    Rather than correct these issues and set standards for patient care, Defendant transfers clinicians to other facilities and allows them to continue to churn through patient visits,

25

which has increased both the clinician's pay and Defendant's Government Health Care Program payments.

**D.      Amedysis' Conduct Resulted in the Submission of False Claims**

115.    A significant portion of Amedysis' patient population consists of patients who are insured under the various government funded healthcare programs, included Medicare, Medicaid, and TriCare.

116.    As a requirement to offer services under these programs, Amedysis must routinely certify its compliance with CMS regulations and guidelines, including that it is providing services that are medically necessary to the treatment of its patients.

117.    For each patient that Amedysis has provided a medically unnecessary service, it has falsely certified compliance with CMS guidelines.  Each false certification made in the submission of a bill for payment violated the FCA.

118.    The conduct and violations of the FCA alleged herein have resulted in millions of dollars in damages to the United States and to the governments of the States.

**E.      Relator Pilat and Relator Maniscalco Were Terminated for Reporting or Otherwise Refusing to be Complicit with Defendant's Conduct**

119.    Relator Pilat and Relator Maniscalco repeatedly expressed his concerns with the insistence of Amedysis, both at the local and at the national level, to push for bigger revenues through medically unnecessary services at the expense of its patient's health and the Government fisc.

120.    As detailed herein, and as evidenced by several emails between Relator and his supervisor Jake Wilkens, Relator Pilat repeatedly expressed concerns about the inability of the nurses and therapists to keep up with Amedysis' extensive volume of patients.  As a result of this

negligence conduct, many patients were only seen for a few minutes rather than an amount of time commensurate with the Government billing.

121.    Relator Pilat was ultimately terminated, at least in part, for his refusal to be complicit with the known fraudulent and dangerous conduct of Amedysis.

122.    Similarly, on numerous occasions, as detailed herein, Relator Maniscalco reported concerns about the admission of and continued treatment of patients who were either homebound or otherwise not covered by the Government Funded Healthcare Programs.

123.    As a result of his complaints, and refusal to comply with the continued fraudulent conduct, Relator Maniscalco was terminated.

## CONCLUSION

124.    Defendant caused the United States and the States to incur substantial damages by presenting, making, using, or causing to be presented, made, or used thousands of False Claims to Medicare and State funded health programs.  The false claims have resulted in remuneration unlawfully received by Defendant.  More specifically, Defendant violated numerous provisions of the FCA, including, but not limited to, the following: 31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. § 3729(a)(1)(C); 31 U.S.C. § 3729(a)(1)(D); and 31 U.S.C. § 3729(a)(1)(G). In light of the foregoing, Defendant is liable to the United States and the States for civil penalties and treble damages.  The estimated damages to the United States and the States caused by the false claims alleged herein are significant.

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)

125.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

126.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

127.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT II
### False Claims Act: Making or Using A False Record
### or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2)

128.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

129.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the defendant – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

130.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III
**False Claims Act: Retaining Overpayment 31 U.S.C. § 3729(a)(I)(G)**

131.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

132.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendant has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowing conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(l).

133.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be detem1ined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV
**RETALIATION (31 U.S.C. § 3730(h))**

134.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

135.    By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of her employment after she lawfully reported what she believed to be fraudulent conduct or wrongdoing to her superiors and corporate representatives in violation of 31 U.S.C. § 3730(h).

136.    Relators seek compensatory damages and other appropriate statutory relief pursuant to this section.

**COUNT V**
**California False Claims Act**
**(Cal. Gov't Code§ 12650, et seq.)**

137.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

138.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of California.

139.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

140.    The California State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

141.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

142.    Pursuant to the California False Claims and Reporting Act, the State of California is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

**COUNT VI**
**Colorado Medicaid False Claims Act**
**(C.R.S. 25.5-4-305, et seq.)**

143.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

144.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Colorado.

145.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

146.    The Colorado State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

147.    By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

148.     Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT VII
### Connecticut False Claims Act
### (Conn. Gen. Stat. §4-274 et seq.)

149.     Relators repeat and incorporate by reference the allegations above as if fully contained herein.

150.     By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Connecticut.

151.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

152.     The Connecticut State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants alleged herein.

153.     By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.     Pursuant to the Connecticut False Claims Act, the State of Connecticut is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT VIII
### Delaware False Claims and Reporting Act
### (Del. Code Ann. Tit. 6 §§ 1201, et seq.)

155.     Relators repeat and incorporate by reference the allegations above as if fully contained herein.

156.     By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Delaware.

157.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

158.     The Delaware State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

159.     By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

160.    Pursuant to the Delaware False Claims and Reporting Act, the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

**COUNT IX**
**Florida False Claims Act**
**(Fla. Stat. Ann. §§ 68.081, et seq.)**

161.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

162.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Florida.

163.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

164.    The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

165.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

166.     Pursuant to the Florida False Claims Act, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT X
### Georgia Taxpayer Protection False Claims Act
### (Ga. Code Ann.§§ 23-3-120, et seq.)

167.     Relators repeat and incorporate by reference the allegations above as if fully contained herein.

168.     By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Georgia.

169.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

170.     The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

171.     By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

172.     Pursuant to the Georgia Taxpayer Protection False Claims Act, the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XI
### Illinois False Claims Act
### (740 Ill. Comp. Stat. §§ 175/1, et seq.)

173.     Relators repeat and incorporate by reference the allegations above as if fully contained herein.

174.     By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Illinois.

175.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

176.     The Illinois State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

177.     By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

36

178.    Pursuant to the Illinois False Claims Act, the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XII
### Indiana False Claims and Whistleblower Protection Act
### (Indiana Code§§ 5-11-5.5, et seq.)

179.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

180.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Indiana.

181.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

182.    The Indiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

183.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

37

184.    Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XIII
### Louisiana Medical Assistance Programs Integrity Law
### (LA Rev Stat § 46:438.3, et seq.)

185.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

186.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Louisiana.

187.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

188.    The Louisiana State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

189.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

190.    Pursuant to the Louisiana's Medical Assistance Programs Integrity Law, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XIV
### Maryland False Claims Act
### (Md. Code Ann. Gen. Prov. §§ 8-101, et seq.)

191.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

192.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Maryland.

193.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

194.    The Maryland State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

195.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

39

196.    Pursuant to the Maryland Medicaid False Claims Act, the State of Maryland is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XV
**Massachusetts False Claims Act**
**(Mass. Gen. Laws ch. 12, §§ SA, et seq.)**

197.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

198.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the Commonwealth of Massachusetts.

199.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims. The Massachusetts State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

200.    By reason of the Defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

40

201.    Pursuant to the Massachusetts False Claims Act, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XVI
### New Hampshire False Claims Act
### (N.H. Rev. Stat. Ann. §§ 167:61, et seq.)

202.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

203.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of New Hampshire.

204.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

205.    The New Hampshire State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

206.    By reason of the Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

41

207.     Pursuant to the New Hampshire False Claims Act, the State of New Hampshire is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XVII
### New Jersey False Claims Act
### (N.J. Stat. Ann.§§ 2A:32C-I, et seq.)

208.     Relators repeat and incorporate by reference the allegations above as if fully contained herein.

209.     By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of New Jersey.

210.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

211.     The New Jersey State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

212.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

213.    Pursuant to the New Jersey False Claims Act, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XVIII
### New York False Claims Act,
### N.Y. Fin. Law §§ 187, et seq.: Making or Using A False Record
### or Statement to Cause Claim to be Paid

214.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

215.    Defendant "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government," in violation of N.Y. Fin. Law § 189.1(b).

216.    Unaware of the falsity of records or statements knowingly made, used, or caused to be made or used by Defendant, the New York state government has paid and continues to pay the claims that would not have been paid but for the acts and conduct of Defendant.

217.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## COUNT XIX
### North Carolina False Claims Act
### (N.C. Gen. Stat. Ann. 52 §§ 1-605, et seq.)

218.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

43

219. By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of North Carolina.

220. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

221. The North Carolina State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

222. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

223. Pursuant to the North Carolina False Claims Act, the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XX
### Oklahoma Medicaid False Claims Act
### (Okla. Stat. tit. 63, §§ 5053 et seq.)

224. Relators repeat and incorporate by reference the allegations above as if fully contained herein.

44

225.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to patients in the State of Oklahoma.

226.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

227.    The Oklahoma State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

228.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

229.    Pursuant to the Oklahoma Medicaid False Claims Act, the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

**COUNT XXI**
**Rhode Island False Claims Act**
**(R.I. Gen. Laws, §§ 9-1.1-1, et seq.)**

230.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

45

231.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid to patients in the State of Rhode Island.

232.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

233.    The Rhode Island State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

234.    By reason of the Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

235.    Pursuant to the Rhode Island False Claims Act, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XXII
### Tennessee False Claims Act
### (Tenn. Code Ann. §§ 4-18-101, et seq.)

236.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

46

237.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for payment or approval in connection with Home Health Services to Medicaid patients in the State of Tennessee.

238.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

239.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein. By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

240.    Pursuant to the Tennessee False Claims Act, the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

### COUNT XXIII
### Texas Medicaid Fraud Prevention Act
### (Tex. Hum. Res. Code §§ 36.001, et seq.)

241.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

242.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for

payment or approval in connection with Home Health Services to Medicaid patients in the State of Texas.

243.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

244.   The Texas State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

245.   By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

246.   Pursuant to the Texas Medicaid Fraud Prevention Act, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XXIV
### Virginia Fraud Against Taxpayers Act
### (Va. Code Ann.§§ 8.01-216.1, et seq.)

247.   Relators repeat and incorporate by reference the allegations above as if fully contained herein.

248.   By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for

payment or approval in connection with Home Health Services to Medicaid patients in the Commonwealth of Virginia.

249.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

250.    The Virginia Commonwealth Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

251.    By reason of the Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

252.    Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## COUNT XXV
### Washington State Medicaid Fraud False Claims Act
### (RCW 74.66.050, et seq.)

253.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

254.    By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for

payment or approval in connection with Home Health Services to Medicaid patients in the State of Washington.

255.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

256.   The Washington State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

257.   By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

258.   Pursuant to the Washington State Medicaid Fraud False Claims Act, the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.


**COUNT XXVI**
**District of Columbia False Claims Act**
**(D.C. Code Ann. §§ 2-308.03, et seq.)**


259.   Relators repeat and incorporate by reference the allegations above as if fully contained herein.

260.   By virtue of the acts alleged herein, Defendant knowingly, or acting with reckless disregard for the truth, presented and/or caused to be presented, false or fraudulent claims for

payment or approval in connection with the sale of medical and/or industrial gases to the District of Columbia.

261.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the District of Columbia to approve and pay such false and fraudulent claims.

262.    The District of Columbia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendant alleged herein.

263.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

264.    Pursuant to the District of Columbia False Claims Act, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, Relators request the following relief from each Defendant, jointly and severally, as to the federal claims:

a.    Three times the amount of damages that the Government sustained because of the acts of Defendants;

b.    A civil penalty of $11,000 for each violation;

c.    An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

51

d.      Award of an amount for reasonable expenses necessarily incurred;

e.      Award of the Qui Tam Plaintiff reasonable attorneys' fees and costs;

f.      Interest;

g.      Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the

False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with

appropriate interest; (2) compensation for special damages sustained by Relator in an amount to

be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive

damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and

litigation costs in connection with Relator's Section (h) claim;

h.      Such further relief as the Court deems just.

**WHEREFORE**, for each of these claims, the Relators request the following relief from each of

the Defendants, jointly and severally, as to the State claims:

A.      Relators and each names State Plaintiff be awarded statutory damages in an

amount equal to two to three times the amount of actual damages sustained by each State as a

result of Defendants' actions, as well as the maximum statutory civil penalty for each violation

by Defendant within each State, all as provided by:

> Cal. Govt. Code § 12651;
> C.R.S. § 25.5-4-305;
> Conn. Gen. Stat. §4-275(8)(b);
> 6 Del. C. § 1201;
> Fla. Stat. Ann. § 68.082;
> Ga. Code Ann. § 23-3-121;
> 740 Ill. Comp. Stat. § 175/3;
> Ind. Code § 5-11-5.5-2;
> LA Rev Stat §438.6(B);
> Md. Code Ann. Gen. Prov. § 2-602(b)(1)(ii);
> Mass. Gen. Laws Ch. 12 § 5B;
> N.H. Rev. Stat. Ann § 167:61-bI;
> N.J. Stat. Ann. § 2A:32C-3;

N.Y. Fin. Law § 189.1(g);
N.C. Gen. Stat. Ann. 52 § 1-607;
Okla. Stat. tit. 63, §63-5053.1(B)(7);
R.I. Gen. Laws § 9-1.1-3;
Tenn. Code Ann. § 4-18-103;
Tex. Hum. Res. Code §36.052(B)(c);
Va. Code Ann. § 8.01-216.3;
RCW §74.66.020(1);
D.C. Code Ann. § 2-308.14;

B.     Relators be awarded their relators' share of any judgment to the maximum

amount provided pursuant to:

Cal. Govt. Code § 12651(g)(2);
C.R.S. § 25.5-4-306(4);
Conn. Gen. Stat. §4-278(e);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.085;
Ga. Code Ann. § 23-3-122(g);
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
LA Rev Stat § 439.4A(1);
Mass. Gen. Laws Ch. 12 § 5F;
Md. Code Ann. Gen. Prov. § § 2-605(a)(i);
N.H. Rev. Stat. Ann § 167:61-eI;
N.J. Stat. Ann. § 2A:32C-7;
N.Y. Fin. Law § 190.6;
N.C. Gen. Stat. Ann. 52 § 1-610;
Okla. Stat. tit. 63, § 63-5053.4(A)(1)
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
Tex. Hum. Res. Code § 36.110(b);
Va. Code Ann. § 8.01-216.7;
RCW §74.66.070(b);
D.C. Code Ann. § 2-308.15;

C.     Relators be awarded all costs and expenses associated with each of the pendent

State claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);
6 Del. C. § 1205;
Fla. Stat. Ann. § 68.086;

53

Ga. Code Ann. § 23-3-121(c);
740 Ill. Comp. Stat. § 175/4(d);
Ind. Code § 5-11-5.5-6;
LA Rev Stat § 439.4A(1);
Mass. Gen. Laws Ch. 12 § 5F;
Md. Code Ann. Gen. Prov. § § 2-605(a)(1)-(2);
N.H. Rev. Stat. Ann § 167:61-eI;
N.J. Stat. Ann. § 2A:32C-8;
N.Y. Fin. Law § 190.7;
N.C. Gen. Stat. Ann. 52 § 1-613;
Okla. Stat. tit. 63, § 63-5053.4(A)(3);
R.I. Gen. Laws § 9-1.1-4;
Tenn. Code Ann. § 71-5-183;
Tex. Hum. Res. Code §36.110(c);
Va. Code Ann. § 8.01-216.7;
RCW §74.66.070(c);
D.C. Code Ann. § 2-308.15;

D.    Relators and the State Plaintiffs be awarded such other and further relief as the

Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby demand trial by jury.

Dated: July 24, 2018                          Respectfully submitted,

                                              SPIRO HARRISON

                                              By: _____
                                                  David B. Harrison
                                                  830 Morris Turnpike
                                                  Short Hills, NJ 07078
                                                  Tel.: (973) 232-0881
                                                  Fax: (973) 232-0887


                                              *Attorneys for Plaintiffs-Relators*