UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
FEB 0 7 2025
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

---

UNITED STATES OF AMERICA *ex rel.*
MICHAEL PILAT and
PHILIP MANISCALCO,

        Plaintiffs,

    v.

AMEDISYS, INC. and DOES 1–100,

        Defendants.

17-CV-136 (JLS) (LGF)

---

## DECISION

Relators Michael Pilat and Philip Maniscalco filed this False Claims Act ("FCA") suit against Amedisys, Inc. and Does 1–100. Dkt. 82.[1] Amedisys moved to dismiss Relators' fourth amended complaint. On November 4, 2024, this Court issued an order denying the motion to dismiss in its entirety. Dkt. 88. This decision sets forth the reasons for that order.

## PROCEDURAL HISTORY

Relators Pilat and Maniscalco filed the original complaint under seal on February 25, 2017, and a first amended complaint under seal on July 25, 2018. Dkt. 1; Dkt. 18. In 2021, the United States, as well as the named states and the District of Columbia, informed the Court that they declined to intervene. Dkt. 38.

---

[1] Earlier versions of the complaint in this case varied slightly in parties and claims. *See* Dkt. 1; Dkt. 18; Dkt. 40; Dkt. 58. The operative version of the complaint is the fourth amended complaint. Dkt. 82.

The Court unsealed the case the same day. Dkt. 39. On August 9, 2021, Relators filed a second amended complaint, which Amedisys moved to dismiss. Dkt. 40; Dkt. 51.

Rather than oppose that motion, Relators filed a third amended complaint (Dkt. 58), which Amedisys moved to dismiss (Dkt. 61). On March 13, 2023, the Court granted Amedisys's motion to dismiss Relators' third amended complaint and denied leave to amend. Dkt. 72. Relators appealed. Dkt. 74. On January 17, 2024, the Second Circuit affirmed in part, vacated in part, and, on March 11, 2024, remanded the case to this Court. Dkt. 78.

After remand, the Court held a status conference, at which the parties discussed next steps and set a schedule. Dkt. 80. On April 17, 2024, Relators filed their fourth amended complaint. Dkt. 82. Amedisys moved to dismiss the fourth amended complaint. Dkt. 83. Relators responded (Dkt. 84), and Amedisys replied (Dkt. 85). The Court heard oral argument and reserved decision. Dkt. 86. On November 4, 2024, the Court issued an order denying Amedisys's motion—and did so before a written decision could be completed—so that the parties could begin discovery without further delay. Dkt. 88. Today's decision sets forth the reasons for denial of the motion.

## THE SECOND CIRCUIT DECISION

The Second Circuit's decision on Relators' third amended complaint provides the framework for analyzing the fourth amended complaint.

### I.    Retaliation

First, regarding Relators' retaliation claims, the Second Circuit concluded that Relators sufficiently alleged that both Pilat and Maniscalco engaged in protected activity. *See* Dkt. 78, at 5–7.[2] The Circuit stated that Maniscalco's "refus[al] [to follow] instructions by his supervisors to recertify [a patient for] a third time, [by] insisting that she was completely independent and it would be unethical to do so"—after his "supervisors had already overruled his recommendations for [that] specific Medicare patient twice and recertified the patient after two six-week programs"—was sufficient to allege that he acted to stop one or more FCA violations. *See id.* at 6 (internal quotation marks omitted). The Circuit further concluded that Pilat's repeated emails to his supervisor "about the inability of the nurses and therapists to keep up with Amedisys's extensive volume of patients," including one specific instance in November 2016, where Pilat told his supervisor that "he had to schedule visits for 3 times as many patients as was safe," were sufficient to allege that he acted to stop one or more FCA violations. *Id.* at 6–7 (internal quotation marks omitted).

---

[2] Page references to docket entries in this case are to the numbering automatically generated by CM/ECF, which appears in the header of each page.

These allegations—related to concerns about patient care—amounted to fraud, the court continued, because Relators also alleged that "Amedisys still billed for the services . . . as if the clinician had actually fully performed them, . . . even though many patients were seen only for a few minutes rather than an amount of time commensurate with the Government billing." *Id.* at 7 (internal quotation marks omitted).

The Second Circuit "express[ed] no view" about whether Pilat and Maniscalco sufficiently alleged the remaining prongs of their retaliation claims, and left it to this Court "to address those questions in the first instance." *Id.*

## II.    FCA Violations

Next, the Second Circuit considered whether Relators satisfied the specificity requirements of Federal Rule of Civil Procedure 9(b), guided by *United States ex rel. Chorches v. American Medical Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017).

As to the first *Chorches* prong, the Second Circuit held that Relators did not allege sufficient facts to demonstrate that billing information was peculiarly within Amedisys's knowledge.  Dkt. 78, at 11–12.  The Circuit recognized that tension existed between Relators' allegations that (1) "in some cases[,] [Maniscalco] was able to later review the forms [submitted by therapists outlining services performed] and noticed changes . . . made by the billing department that specifically increased the revenue to Amedisys," and that (2) Relators only had contact with the billing department "when coding specialists initiated conversations by reaching out over telephone," and "neither Relator was privy to the submission of the bills or

invoices to Government Funded Healthcare Programs." *Id.* (internal quotation marks omitted).

The Second Circuit noted that Relators could fix this pleading defect by explaining "any distinction between the treatment forms they had access to and the actual bills that comprised the false claims." *Id.* at 15. Relators also could "attempt to reconcile their access to some forms used by the billing department with their allegations that the billing department operated out of their purview." *Id.* And Relators could "describe their *digital* access to treatment and billing records at Amedisys, and explain whether and how they could virtually access the billing record at issue." *Id.* at 15–16 (emphasis in original).

Regarding the second *Chorches* prong, the Second Circuit concluded that Relators sufficiently alleged a strong inference that Amedisys submitted false claims to the government. *See id.* at 8–11. It cited examples alleged in the third amended complaint, in which "a clinician was instructed either to document patient information falsely to allow for treatments for which the patient did not qualify, or to recommend an unnecessary course of treatment." *Id.* at 9–10. Relators also "identified multiple specific instances in which Amedisys falsified timesheets," including by assigning nurses a weekly caseload that "made it physically impossible to spend adequate time with each patient and resulted in billing for work never performed." *Id.* at 10.

5

III.    **State FCA Claims and Leave to Amend**

The Second Circuit affirmed this Court's dismissal of Relators' state FCA claims. *See id.* at 16. It also concluded that Relators should have leave to amend their federal FCA claims, but not their state FCA claims. *Id.* at 16–17.

## FOURTH AMENDED COMPLAINT[3]

Relators allege that Amedisys is a home health services company whose revenues began to suffer after facing allegations of Medicare fraud and entering into a 2014 settlement agreement with the Department of Health and Human Services. Dkt. 82 ¶¶ 1–7. In May 2015, Pilat began working at Amedisys's Amherst, New York home health center as a clinical manager assistant and, in June 2015, Maniscalco began working there as a physical therapist. *Id.* ¶¶ 8–9.

During their employment, Relators observed, and became personally aware of, numerous allegedly fraudulent practices by Amedisys designed to generate or inflate revenues through Medicare, Medicaid, TRICARE, and other government-funded healthcare programs. *Id.* ¶ 12; *see also id.* ¶ 1. Amedisys allegedly sought government payment for home health services that were not eligible for reimbursement because it: (1) improperly recruited patients for home health services via relationships with hospitals and nursing homes, without evaluating eligibility or need, and without receiving proper approval from the patients' physicians; (2) fraudulently billed for improper and/or medically unnecessary

---

[3] This section contains a brief summary of the fourth amended complaint. For a full recitation of the facts alleged in the fourth amended complaint, see Dkt. 82.

treatment, including patients who were not homebound or who no longer required treatment; (3) falsified time records to bill for services not provided or improperly rendered, as well as unsafe overscheduling of clinicians, leading to inadequate patient care; (4) inflated Medicare and Medicaid reimbursements by "upcoding" patients for a more severe diagnosis and more intensive level of care than was warranted; and (5) falsified time entries to report that clinicians spent more time with a patient than they actually did. *See id.* ¶¶ 66(a)–(e); *id.* ¶¶ 67–156.

Amedisys primarily employed these strategies at the direction, and under the guidance, of senior regional personnel and officers from its headquarters. *Id.* ¶ 17. From at least 2015 onward, these practices resulted in fraudulent billing practices and thousands of violations of the FCA and of the state false claims acts. *Id.* ¶ 23.[4]

The fourth amended complaint contains claims for: (1) presentation of false claims, in violation of 31 U.S.C. § 3729(a)(1)(A), *see* Dkt. 82 ¶¶ 183–85; (2) making or using a false record or statement to cause a claim to be paid, in violation of 31 U.S.C. § 3729(a)(1)(B), *see* Dkt. 82 ¶¶ 186–88; and (3) retaliation as to each Relator, in violation of 31 U.S.C. § 3730(h), *see id.* ¶¶ 189–91.

## LEGAL STANDARDS

### I.    Motion to Dismiss

On a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), a "court's task is to assess the legal feasibility of the complaint." *Lynch v. City of N.Y.*, 952

---

[4] As discussed above, the Second Circuit affirmed this Court's dismissal of Relators' state FCA claims. *See* Dkt. 78, at 16–17.

F.3d 67, 75 (2d Cir. 2020). The court "must take the facts alleged in the complaint as true, drawing all reasonable inferences in [the plaintiff's] favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007). To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal quotation marks and citation omitted).

This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Plausibility depends on many considerations: "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render [the] plaintiff's inferences unreasonable." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (internal quotation marks and citation omitted).

## II.    False Claims Act and Rule 9(b)

The False Claims Act is an anti-fraud statute "enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." *Chorches*, 865 F.3d at 81 (quoting *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 653 (2015)) (internal quotation marks omitted). In relevant

8

part, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States government, 31 U.S.C. § 3729(a)(1)(A), "knowingly makes, uses, or causes to be made or used, a false record or statement material to [such] a false or fraudulent claim," *id.* § 3729(a)(1)(B), or "conspires to commit [either] violation," *id.* § 3729(a)(1)(C). The FCA defines a "claim" as "'any request or demand . . . for money or property' that is presented, directly or indirectly, to the United States." *Chorches*, 865 F.3d at 81 (quoting 31 U.S.C. § 3729(b)(2)(A)).

Substantive FCA allegations are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Id.* (first citing *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016), and then citing *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995)). When allegations involve fraud, Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). An FCA complaint alleging fraud[5] ordinarily must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81 (internal quotation marks and citation omitted). Courts sometimes characterize this pleading standard "as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Monda v. Sikorsky Aircraft Corp.*, No. 3:99CV1026

---

[5] The pleading requirements for retaliation claims are discussed *infra*.

(JBA), 2005 WL 1925903, at *2 (D. Conn. Aug. 11, 2005), *aff'd*, 207 F. App'x 28 (2d Cir. 2006) (citations omitted).

The adequacy of particularized allegations under Rule 9(b) is "case-and context-specific." *Chorches*, 865, F.3d at 81 (internal quotation marks and citation omitted).  Courts have described the "threefold" purpose of Rule 9(b) as "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Ladas*, 824 F.3d at 25 (internal quotation marks and citation omitted).  A court must dismiss a complaint under Rule 9(b) where FCA claims under Sections 3729(a)(1)(A) and (B) rest on "speculation and conclusory allegations." *United States ex rel. Duhaine v. Apple Health Care Inc.*, No. 3:19-CV-00963 (KAD), 2022 WL 3226631, at *5 (D. Conn. Aug. 10, 2022) (quoting *United States ex rel. Gelbman v. City of N.Y.*, 790 F. App'x 244, 249 (2d Cir. 2019)) (internal quotation marks omitted).

Despite Rule 9(b)'s strict pleading requirements, allegations may be based on "information and belief when facts are peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 81–82 (internal quotation marks and citation omitted).  Where pleading is permitted on information and belief, the complaint must "adduce specific facts supporting a strong inference of fraud." *Id.* at 82 (internal quotation marks and citation omitted).

## DISCUSSION

Amedisys argues that the Court should dismiss the fourth amended complaint in its entirety. *See* Dkt. 83-1, at 6. In particular, Amedisys argues that Relators did not allege that Amedisys was aware of either Pilat's or Maniscalco's protected conduct, and did not allege that either Pilat or Maniscalco was terminated in retaliation for that conduct. *See id.* at 22–26. Amedisys also argues that Relators' FCA claims do not satisfy Rule 9(b), under *Chorches*. *See id.* at 13–18. Finally, Amedisys argues that Relators do not allege falsity because several of their theories of falsity cannot support an FCA violation, do not allege a false certification claim (express or implied), and do not allege a false-records claim. *See id.* at 18–22. As reflected in the order denying the motion to dismiss, this Court disagrees.

## I.    The Fourth Amended Complaint Sufficiently Alleges Retaliation Claims as to Pilat and Maniscalco

The FCA's anti-retaliation provision states:

> [a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA].

31 U.S.C. § 3730(h)(1).[6]

---

[6] Before 2009, Section 3730(h) provided a non-exclusive list of specific "lawful acts" done in furtherance of an FCA action that protected an employee—and did not include the broader language of "other efforts to stop . . . violations" that is now included in Section 3730(h). *Chorches*, 865 F.3d at 97 (quoting 31 U.S.C. § 3730(h) (2006)) (internal quotation marks omitted).

To state a retaliation claim under the FCA, courts "generally require[] a plaintiff to show that (1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (quoting *Chorches*, 865 F.3d at 95) (internal quotation marks omitted).  If an employee's alleged actions "are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee," then the employee has stated a retaliation claim under Section 3730(h). *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

FCA-based retaliation claims are not subject to the more stringent pleading requirements of Rule 9(b).  *See Chorches*, 865 F.3d at 95 ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA.").  Rather, a plaintiff must "show a good faith basis, or 'objectively reasonable basis, for believing that he or she was investigating matters in support of a viable FCA case." *Swanson v. Battery Park City Auth.*, No. 15-CV-6938 (JPO), 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016) (internal quotation marks and citation omitted).  Ultimately, the conduct must be "directed at exposing a fraud upon the government." *Mirza v. Garnet Health*, No. 20-CV-556 (PMH), 2022 WL 826410, at *9 (S.D.N.Y. Mar. 17, 2022) (internal quotation marks and citations omitted).

As explained above, the Second Circuit held that both Pilat and Maniscalco engaged in protected activity under the statute.  This Court must consider whether

12

the fourth amended complaint sufficiently alleges that Amedisys was aware of Pilat's and Maniscalco's protected activity, and whether Amedisys took adverse action against Pilat and Maniscalco because of their protected activity.

### A.    Pilat

The fourth amended complaint contains sufficient allegations regarding each of the remaining two prongs as to Pilat.

Regarding Amedisys's awareness of his protected activity, the fourth amended complaint alleges that "Pilat relayed . . . nurses' messages about unsafe workload"—specifically, scheduled patient visits numbering fifteen to seventeen per day, rather than the standard five to six—"to Amedisys supervisors." Dkt. 82 ¶ 127. It also alleges that Pilat "notified management about the unsafe clinician scheduling," including telling Director of Operations Jake Wilkens, in a November 2016 email, that "he had to schedule visits for '3 times as many patients as was safe.'" *Id.* ¶ 129. More generally, the fourth amended complaint alleges that, in "several emails between . . . Pilat and his supervisor, Wilkens, . . . Pilat repeatedly expressed concerns about the inability of the nurses and therapists to keep up with Amedisys's extensive volume of patients." *Id.* ¶ 177. These allegations plausibly allege that Amedisys was aware of Pilat's protected activity.

Amedisys argues that this conduct did not put it on notice to Pilat's protected conduct because his conduct amounted to raising concerns about patient scheduling, which was within his job duties. *See* Dkt. 83-1, at 23–24. A job-duty argument sometimes prevails, but not here.

13

The cases Amedisys relies on for application of this argument here are distinguishable—especially against the backdrop of the Circuit's decision in this case. *See Hennrick v. MIR Sci., LLC*, No. 21 Civ. 4945 (LGS), 2021 WL 6052118, at *1, *4 (S.D.N.Y. Dec. 21, 2021) (plaintiff "responsible for overseeing Defendant's laboratory practices, complying with applicable FDA regulations, [and] applying for and receiving [New York State Department of Health] . . . approval" of Defendant's test did not put Defendant on notice of FCA violations by reporting issues with submitted data because "it was Plaintiff's job to raise concerns about the accuracy of data being submitted to the FDA and [the New York State Department of Health] in Defendant's applications"); *Ortiz v. Todres & Co.*, No. 15 Civ. 1506 (LGS), 2019 WL 1207856, at *1, *5 (S.D.N.Y. Mar. 14, 2019) (plaintiff auditor did not put defendant on notice of FCA violations by stating that "issuing the financial statements any other way would be a misrepresentation" because plaintiff was not "doing anything other than what he was hired to do").

Here, by contrast, Pilat "was responsible for supporting the clinical management teams, including scheduling staff for patient care and managing patient referrals." Dkt. 82 ¶ 8. He was not responsible for alerting Amedisys to concerns about patient care or safety. Pilat's protected conduct of repeatedly notifying his supervisor "about the inability of the nurses and therapists to keep up with Amedisys's extensive volume of patients," including that "he had to schedule visits for 3 times as many patients as was safe," Dkt. 78, at 6–7 (internal quotation marks omitted); *see* Dkt. 82 ¶ 129, went "beyond [his] assigned task," and was thus

sufficient to put Amedisys on notice of that protected activity, *see Ortiz*, 2019 WL 1207856, at \*5 (internal quotation marks and citation omitted).

      The fourth amended complaint also plausibly alleges that Amedisys took adverse action against Pilat because of his protected conduct. In particular, it alleges that "Pilat was fired a short time after" his November 2016 email to Wilkens expressing concerns about patient scheduling. Dkt. 82 ¶ 129. Amedisys terminated Pilat's employment "in December 2016, at least in part for his refusal to be complicit with the known fraudulent and dangerous conduct of Amedisys that resulted in violations of the FCA." *Id.* ¶ 178. These allegations are sufficient for Pilat's retaliation claim to proceed to discovery. *Compare Beckles-Canton v. Lutheran Soc. Servs. of N.Y., Inc.*, No. 20 Civ. 4379 (KPF), 2021 WL 3077460, at \*9–\*10 (S.D.N.Y. July 20, 2021) ("A seven-month gap is itself 'not prohibitively remote' and [is] 'within the temporal range that [the Second Circuit has] found sufficient to raise an inference of causation.'") (citations omitted), *and United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 300 (E.D.N.Y. 2016) (denying motion to dismiss FCA retaliation claim where plaintiff met with employer "in January of 2010 to respond to his complaints and . . . was constructively discharged in April of 2010"), *with McAllan v. Von Essen*, 517 F. Supp. 2d 672, 686 (S.D.N.Y. 2007) (granting summary judgment for defendant on FCA retaliation claim, in part because "plaintiff had continued to work for almost three years after commencing his FCA action without incident").

Amedisys argues that the fourth amended complaint does not sufficiently allege but-for causation as to Pilat's termination. *See* Dkt. 83-1, at 24–25. The allegation that Pilat was terminated "at least in part for" his protected conduct (Dkt. 82 ¶ 178) is not inconsistent with but-for causation. If, for example, there was some deficiency with Pilat's job performance that Amedisys was willing to endure until Pilat expressed concerns about patient care and volume of cases assigned to nurses, then Pilat's protected conduct would be a but-for cause for his termination. Any evidence will be revealed—or not—during discovery. And Amedisys may raise that issue again at summary judgment.

### B.    Maniscalco

As to Maniscalco's retaliation claim, Amedisys challenges only the third prong: whether Amedisys took adverse action against Maniscalco because of his protected activity. The Court, therefore, will only briefly address the notice prong.

The fourth amended complaint alleges that, "on numerous occasions, . . . Maniscalco reported concerns about the admission of and continued treatment of patients who were either not homebound or otherwise not covered by Government Funded Healthcare Programs, which resulted in violations of the FCA." Dkt. 82 ¶ 179. It further alleges that, "when . . . Maniscalco raised his concerns to Wilkens in May 2017, Wilkens told him his goal was to ensure the 'best possible outcome for reimbursement.'" *Id.* ¶ 180. These allegations satisfy the notice prong of Maniscalco's retaliation claim.

16

Amedisys argues that the fourth amended complaint does not sufficiently allege that Maniscalco was terminated because of his protected conduct because the claim relies solely on the timeframe of his termination in relation to his protected conduct. *See* Dkt. 83-1, at 25–26. The fourth amended complaint alleges that, "[a]s a result of his complaints, and refusal to comply with the continued fraudulent conduct, . . . Maniscalco was terminated on June 7, 2017, less than a month after [his May 2017] conversation [with Wilkens]." Dkt. 82 ¶ 181. This alleged temporal proximity, combined with the allegations about Maniscalco's protected conduct, satisfies the causation prong at this stage. *See Beckles-Canton*, 2021 WL 3077460, at *9–*10; *N. Adult Daily Health Care*, 205 F. Supp. 3d at 300.

## II.   The Fourth Amended Complaint Sufficiently States FCA Violations

Amedisys also seeks dismissal of Relators' claims for presentation of false claims and making or using a false record—based both on *Chorches* and substantive deficiencies. Each argument fails.

### A.   The Fourth Amended Complaint Satisfies *Chorches*

Relators must rely on *Chorches* to plead their FCA violations because they do not allege the actual submission of false claims.[7] The Second Circuit has concluded that Relators did not allege sufficient facts to demonstrate that billing information was peculiarly within Amedisys's knowledge—in other words, they did not satisfy

---

[7] *See Chorches*, 865 F.3d at 82–83 (recognizing that, that, in some cases, a plaintiff may satisfy the more rigid pleading requirements of Rule 9(b) by (1) asserting specific reasons why such information is peculiarly within another's knowledge, and (2) providing "specific facts supporting a strong inference of fraud") (internal quotation marks omitted).

17

the first *Chorches* prong.  Dkt. 78, at 11–12.  It noted that Relators could cure this deficiency by (1) explaining "any distinction between the treatment forms they had access to and the actual bills that comprised the false claims," (2) "reconcil[ing] their access to some forms used by the billing department with their allegations that the billing department operated out of their purview," and (3) "describ[ing] their *digital* access to treatment and billing records at Amedisys, and explain[ing] whether and how they could virtually access the billing records at issue."  *Id.* at 15–16 (emphasis in original).  Because the fourth amended complaint does so, it alleges FCA violations with sufficient specificity.

First, the fourth amended complaint describes, in detail, Amedisys's structure—including its "billing procedures[, which] are . . . layered and compartmentalized, giving only Amedisys's central billing department (located in Baton Rouge, LA) access to the actual bills submitted to the Government."  Dkt. 82 ¶ 157; *see also id.* ¶ 158 (describing structure of nationwide branches, regions, local branches, and regional groups).  Each branch had a business office manager, whose "primary responsibility, as it related to patient billing, was to ensure that all the information necessary for converting clinical therapy services into bills was completed, including patient treatment/evaluation forms and OASIS assessments."[8]  *Id.* ¶ 159.

---

[8] OASIS is Outcome and Assessment Set, which is a tool to "determine the patient's care needs," using clinical, functional, and service factors, that helps nurses evaluate eligibility for Medicare home health care.  *Id.* ¶ 55.

Relators worked at Amedisys's Amherst, New York facility. *Id.* ¶¶ 8 (Pilat), 9 (Maniscalco). The assistant director of operations responsible for Amherst, and Maniscalco's direct supervisor, was Sue Troy, who reported to Director of Operations Jake Wilkens. *Id.* ¶¶ 10, 11. Wilkens "oversaw the operations of the individual facility." *See id.* ¶ 158. Troy "had a team of clinicians or therapists that worked for [her] out in the field handling patient visits." *See id.*; *see also id.* ¶ 160 (assistant directors of operations "directly managed therapists who worked in the field").

Second, the fourth amended complaint explains the software Amedisys used for clinical information. Each therapist, including Maniscalco, "was issued a tablet, which gave [him or her] access to a software tool called 'PointCare.'" *Id.* ¶ 160. PointCare assisted with "collection of all pertinent treatment and OASIS information for a given patient." *Id.* ¶ 161. It was "a central portal for the collection of all clinical information that was later used to support the conversion of services into bills." *Id.* Therapists used PointCare to submit "OASIS assessment[s] and their clinical treatment and evaluation forms," usually "following the initial visit[,] which documented . . . the patient condition and prescribed treatment regimen." *Id.* ¶ 162; *see also id.* ¶ 170 ("Maniscalco's Amedisys tablet enabled him to submit his OASIS assessments and clinical treatment forms through PointCare.").

Next, the fourth amended complaint details how the treatment-related forms were submitted for billing. Business office managers ensured that all necessary

forms were completed in PointCare, approved them, and "submitted [them] to a centralized billing department at Amedisys headquarters in Baton Rouge, LA." *Id.* ¶ 164; *see also id.* ¶ 172. "All patient billing" occurred "at this centralized location[, and] no government patient billing was conducted at a local branch facility." *Id.* ¶ 164; *see also id.* ¶ 173.

Finally, the fourth amended complaint contrasts the treatment-related forms Relators did have access to, with the billing information that they did not have access to. Relators allege that neither of them "had any access to the compilation, maintenance, or submission of bills or invoices to Government Funded Healthcare Programs" because "Amedisys operated an off-site billing department that gathered treatment forms submitted by therapists detailing information collected during patient visits and converted those treatment forms to billings to the Government." *Id.* ¶ 166. Not only that, but even area vice presidents, directors of operations, assistant directors of operations, and business office managers lacked access to specific patient billing information; they "had access [only] to certain aggregated treatment and revenue data used evaluate performance and set business targets." *Id.* ¶ 165.

Pilat, specifically, "had no access to any internal digital billing systems or billing software." *Id.* ¶ 167. He "was provided a workstation with a computer and an email address," but "the vast majority of [his] work was conducted with paper scheduling records." *Id.* His responsibilities were limited to "coordinating the

schedules of nurses and therapists"—clinicians in the field—"with whom he communicated via email." *Id.*

Maniscalco worked primarily offsite, "travel[ing] from his home directly to patients' homes and rehabilitation facilities to provide home health services nearly every day." *Id.* ¶ 168. He occasionally "attend[ed] meetings at the Amedisys branch to discuss his patients, patient loads, and patient treatments," but this was "the only time he was onsite at an Amedisys office." *Id.* "Specific patient billing detail was never discussed at these meetings." *Id.* ¶ 169.

As described above, Maniscalco had access to treatment-related forms. But those forms "contained only relevant clinical, treatment information, including patient identification information, patient conditions, and patient treatments." *Id.* ¶ 171. They "did not contain any billing information, such as treatment codes, billing dates, or billing amounts." *Id.* Occasionally, Maniscalco could "view treatment forms that had been changed by off-site coding specialists in the PointCare software portal,"[9] but "the changes related only to the types of treatments he performed and the conditions of the patients." *Id.* ¶ 174. He did not—and could not—see patient billing information "because PointCare did not store patient specific billing information," and PointCare "was the only Amedisys program he had access to." *Id.*

_____

[9] Relators allege that remote coding specialists sometimes "unilaterally manipulated the treatment forms to falsely enhance Amedisys's reimbursements from Government Funded Healthcare Programs," including by "fabricat[ing] patient conditions, treatment severity, and duration" to "maximize reimbursement." *Id.* ¶ 163.

In sum, Relators allege that neither Pilat nor Maniscalco had "information regarding what was included in the bills, how the bills were created, how the bills were submitted, when the bills were submitted, or who at Amedisys specifically was responsible for processing the bills," and they did not have access to any of this information. *Id.* ¶ 175.

These allegations address each category of information the Second Circuit suggested could cure the pleading defects with Relators' prior complaint and, thereby, satisfy *Chorches*.[10] They explain the difference between treatment forms and bills, which were generated based on information in the treatment forms, but separately from them. The additional allegations explain how Maniscalco had access only to the treatment-related information and the software platform through which such information was transmitted, and Pilat did not even have access to that software. Finally, the additional allegations clarify that the billing information was both physically and electronically segregated from Pilat, Maniscalco, and the Amherst branch—and that neither Relator could access bills or billing information, either physically or digitally.

---

[10] These allegations also are similar to those in *Chorches*, where the Second Circuit concluded that the relators satisfied the first prong. *See Chorches*, 865 F.3d at 82 (complaint alleged that all ambulance personnel (like the relator) generally were unable to enter the administrative building where billing took place and were not able to participate in billing procedures; these particular circumstances "made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false").

The fourth amended complaint, therefore, alleges FCA violations with sufficient specificity, pursuant to *Chorches*.

**B.     Relators Allege Sufficient Theories of Falsity to Support Their FCA Claims**

Amedisys also challenges the substance of Relators' FCA violations.  In particular, Amedisys argues that Relators fail to allege falsity because several alleged theories of falsity do not concern illegal or fraudulent conduct to support an FCA violation, and that Relators do not allege false certification.  *See* Dkt. 83-1, at 18–21.  Because the Second Circuit endorsed certain theories of falsity that also appear in the fourth amended complaint, the Court concludes that the complaint sufficiently alleges FCA violations.

To state a claim under Sections 3729(a)(1)(A) and (B), a plaintiff must allege that "(1) defendant submitted a claim for payment to the government, (2) the claim for payment was false or misleading, (3) the defendant acted knowingly in making that false or misleading claim for payment, and (4) the false or misleading statement was material to the government's decision to pay."  *United States ex rel. Bonzani v. United Techs. Corp.*, No. 3:16-CV-1730 (JCH), 2019 WL 5394577, at *2 (D. Conn. Oct. 22, 2019) (citing *Chorches*, 865 F.3d at 81).

Here, Relators allege various theories of falsity as the basis for their FCA claim, including: (1) improperly recruiting and enrolling patients; (2) providing, and billing for, unnecessary and/or non-covered patient treatments; (3) fraudulently billing for services not rendered or improperly rendered; (4) upcoding services provided to patients; and (5) falsifying time entries by making

it appear that therapists spent longer with patients than they did. *See* Dkt. 82 ¶¶ 66(a)–(e). They also allege specific examples to support these theories, as discussed in more detail above. Together, these allegations underlie Relators' claim that:

> by providing medically unnecessary treatments to ineligible patients, as well as falsifying patients' medical reports and plans of care in order to seek reimbursements for conditions that were more severe than in reality and for durations longer than medically necessary, Amedisys "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

Dkt. 82 ¶ 184.

Amedisys focuses on Realtors' improper recruitment/enrollment and fraudulent billing theories, implicitly conceding that the remaining three theories are sufficient to support an FCA violation. *See* Dkt. 83-1, at 18 ("[S]ome of Relators' legal theories . . . do not involve conduct that was improper, and these theories . . . cannot support a violation of the FCA."). Indeed, Amedisys must so concede because the Second Circuit recognized providing medically unnecessary treatments and falsifying time sheets as fraud. Dkt. 78, at 6–7, 9–10; *see also* Dkt. 87 (transcript of oral argument), at 36 ("Medical necessity, falsification of time records, we agree that those are two theories [for which] the Second Circuit found a sufficient inference of fraud.").

The Second Circuit's decision, along with Amedisys's resulting concessions, allow Relators' claim for presenting a false claim to survive. With a surviving FCA

claim, the Court declines Amedisys's invitation to cull *theories* of falsity.[11]  The

parties will be able to address these issues during discovery and then, if

appropriate, at summary judgment.[12]

### C.     Relators Sufficiently Allege a False-Records Claim

Amedisys argues that the Court should dismiss Relators' false-records claim

because Relators (1) do not sufficiently allege false claims, and (2) do not plead the

false contents of the Form 485s, upon which their false records claim rely, with

sufficient specificity.  *See* Dkt. 83-1, at 22; Dkt. 85, at 12.  For the reasons

discussed earlier in this section, the fourth amended complaint alleges FCA

violations with sufficiently specificity.  *See supra* Sections II.A & II.B.  The Court,

therefore, denies Amedisys's motion to dismiss Relators' false-records claim.

---

[11] At oral argument, defense counsel conceded that it would be helpful—perhaps,
more efficient—to trim Relators' theories from the complaint at the motion-to-
dismiss stage, but that the parties could address Amedisys's arguments later in the
case.  *See* Dkt. 87, at 37.

[12] Along the same lines, because the fourth amended complaint sufficiently alleges
an FCA violation via a direct false claim, the Court need not resolve Amedisys's
arguments regarding false certification, at this time.  *See* Dkt. 87 (transcript of oral
argument), at 39–44.

## CONCLUSION

For the reasons discussed above, the Court has DENIED Amedisys's motion to dismiss the fourth amended complaint (Dkt. 83). Based on Relators' counsel's agreement, *see* Dkt. 87, at 44, the Clerk of Court shall terminate Does 1–100 as Defendants in this case.

SO ORDERED.

Dated:      February 7, 2025
            Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE